MINNESOTA MINING AND MAN-
UFACTURING COMPANY,
Appellant,

v.

Clarence A. METER, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Appellee.

No. 19003.

United States Court of Appeals
Eighth Circuit.

Nov. 2, 1967.

Thomas M. Vogt, St. Paul, Minn., for appellant; Charles F. Bisanz, of Felhaber, Larson, Fenlon & Vogt and Thomas J. Scheuerman, St. Paul, Minn., were with him on the brief.

Julius G. Serot, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., for appellee; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel and Marvin Roth, Atty., N. L. R. B., Washington, D. C., were with him on the brief.

Before MATTHES, GIBSON and LAY, Circuit Judges.

MATTHES, Circuit Judge.

Minnesota Mining and Manufacturing Company (3M or Company) has appealed from an order of the district court granting a temporary injunction pursuant to the provisions of Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) (1947).[1] We have jurisdiction under 28 U.S.C. § 1292 (1948).

The procedural chronology of this case can be briefly summarized as follows. On July 10, 1967, the Oil, Chemical and Atomic Workers International Union, AFL–CIO and its Locals 6–75 and 6–418 (hereinafter called the Union or OCAW) filed a charge alleging that 3M had committed unfair labor practices within the meaning of Section 8(a) (1) and (5) of the Act. The events which spawned the unfair labor practice charge revolved around the question whether 3M was required to bargain with the selected negotiating committee of the OCAW notwithstanding the presence of representatives from other unions whom the OCAW had invited to attend the negotiations for the purpose of participating in the discussion

and advising it. 3M firmly took the position that inclusion of other union representatives in effect forced it to bargain on a nationwide basis, a method of bargaining concededly illegal in the absence of mutual consent by the parties involved. Concluding that there was "reasonable cause" to believe that the Company was engaged in the unlawful conduct as charged, the Regional Director of the National Labor Relations Board on August 2nd issued a formal complaint against 3M, and a hearing was set for September 6th. In the interim on August 11th, the Regional Director filed in the district court a petition for a temporary injunction pursuant to Section 10 (j). On September 6, 1967, after giving 3M a full hearing in response to his show cause order, the district judge, Honorable Philip Neville, entered a temporary injunction, from which this appeal is taken, restraining 3M from refusing to bargain collectively with the OCAW and its local affiliates through its chosen representatives "including not to exceed three, nonvoting * * * representatives from other unions and/or plants of the [Company] * * *."

The pertinent background facts are not in dispute. 3M is a manufacturer of industrial abrasives, tapes, duplicating equipment and numerous other products. Less than ten percent of its business involves government contracts. It operates approximately seventy plants throughout the United States and has some fifty-five separate collective bargaining agreements with various local unions covering its operations. The OCAW and its two affiliated Locals 6–75 and 6–418 are the respective bargaining representatives at 3M's St. Paul and Hastings, Minnesota plants.[2] The OCAW also represents employees at six other 3M plants.

1. Section 10(j) provides in pertinent part:
   "The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court * * * for appropriate temporary relief or restraining order. Upon the filing of

any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

2. There are approximately 850 employees in the Local 6–418 bargaining unit and 2,450 employees in the Local 6–75 unit.

Previous contract negotiations between 3M and the OCAW have always been conducted on a plant-by-plant basis, although the Union since 1957 has requested 3M to bargain on a company-wide basis on certain cost items. With the exception of an original recognition strike and a short work stoppage 3M has bargained amicably and successfully for a period of almost twenty years with the OCAW and Local 6–75 for the St. Paul plant, and for a period of approximately seventeen years with the OCAW and Local 6–418 for the Hastings plant. Although each plant has a separate collective bargaining agreement with each Local, major cost items for the two plants have been negotiated jointly while non-cost or operational items have been negotiated on a single plant basis. The most recent contracts covering the St. Paul and Hastings plants were effective from May 4, 1964 to August 27, 1967, and by agreement of the parties were extended to September 17, 1967.

Prior to 1967, the composition of the Union's negotiating committee had consisted of four officers and five area committeemen, elected by the membership, and various international representatives of the OCAW. Since 1962 the Union has also been represented by Stephen I. Harris, a representative of the Industrial Union Department of the AFL–CIO (I.U. D.), who is an expert on pensions. At no time prior to 1967 did the Union's negotiating committee include officers or members of other labor organizations having collective bargaining agreements with 3M.

Shortly before the expiration date of the contracts, the OCAW, in conjunction with the I.U.D., initiated new negotiations with 3M in accordance with the contract terms. The Union's proposed bargaining pattern, however, had somewhat changed in that it now included a program of "coordinated bargaining," which 3M contends was designed to force it to negotiate major economic items on a national level. In June of 1967 the OCAW advised 3M that the Union's negotiating committee would include representatives from other unions representing 3M plants for the 1967 St. Paul-Hastings contract negotiations.[3] The reason given for inclusion of these additional representatives was that they were needed to intelligently evaluate and verify various presentations made by 3M regarding labor contracts and conditions at other plants, inasmuch as 3M utilized these factors in comparing current contract suggestions submitted by the Union. The record clearly reveals, however, that these additional representatives were present solely in an advisory capacity to negotiate in behalf of the two OCAW Locals and had no vote on the question of acceptance or rejection of 3M proposals.[4]

On June 27th, and again on July 7th and 10th, 3M's Director of Industrial Relations, Charles F. Tourek, informed the Union representatives that the Company was not prepared to bargain with a negotiating committee that included members of other unions, but would meet "under

3. This notification was in the form of a letter written by Mr. Lyman Covert, a director of the OCAW, to Mr. Charles F. Tourek, Director of Industrial Relations for 3M, the pertinent portion of which is as follows:

"We also wish to inform you that our Negotiating Committee for the forthcoming Negotiations will at times include certain Members or Officers of other Labor Organizations. These individuals, when they participate in our Negotiations, will be part of our Bargaining Committee, and will be Negotiating only for our Bargaining Unit. We have been advised that we have the Legal Right to include such persons on our Negotiating Committee. If you have any objections to their participation, please let me know immediately so that we can attempt to come to some understanding about this matter before the Negotiations commence."

4. The record also discloses that the Union had previously suggested to the Company during the 1962 contract negotiations that representatives of other unions from 3M plants be permitted to attend the negotiations in order to advise and consult with the OCAW bargaining committee. The Company opposed the idea and the matter was then dropped.

the same conditions as in the past." On the basis of the Company's stated opposition to the presence of "outsiders," the Union on July 10, 1967 filed the current unfair labor practice charge, alleging that the Company had refused to bargain with the Union in violation of Sections 8 (a) (1) and (5).

Despite the pendency of this unfair labor practice charge a meeting was pre-arranged for July 14th. Negotiations commenced with the same Union entourage that was characteristic of former negotiations between 3M and the OCAW, but during the course of the meeting an OCAW representative announced that two representatives of other unions would join the negotiating committee. As these individuals entered the meeting the 3M negotiators, headed by Tourek, departed.

On the basis of the foregoing facts the district court concluded that there was "reasonable cause" to believe that 3M had violated and was continuing to violate the provisions of Sections 8(a) (1) and (5), and that unless enjoined such conduct would continue to be detrimental to the interests of the OCAW and its members. The court accordingly restrained 3M from refusing to bargain with the OCAW solely on the basis of the composition of its negotiating committee.

■ The scope of our review of a Section 10(j) proceeding is limited to determining whether the district court's finding that there was reasonable cause to believe that the Company violated Sections 8(a) (1) and (5) is clearly erroneous, and whether the court abused its discretion in granting injunctive relief. Cf. Local Joint Board, Hotel & Restaurant, etc., Union v. Sperry, 323 F.2d 75, 77 (8th Cir. 1963); [5] See also Johnston v. J. P. Stevens & Company, 341 F.2d 891, 892 (4th Cir. 1965); Douds v. International Longshoremen's Ass'n., 241 F.2d 278, 285 (2d Cir. 1957).

The question upon which the parties are in disagreement concerns the standard to be applied by the district court in determining whether injunctive relief should be granted. 3M contends for the proposition that under Section 10(j) an injunction is an extraordinary remedy and may be granted only where traditional equity criteria are present, that is, where relief is necessary in order to preserve the status quo or prevent irreparable harm pending the determination on the merits of the labor dispute by the N. L. R. B. The Board, on the other hand, submits that the standard in the district court is whether there is reasonable cause to believe that a violation of the Act, as charged, has been committed and whether injunctive relief is "just and proper."

■ The statute itself provides little assistance in determining what standards are to be applied, since it lays down no definitive guidelines for imposition of injunctive relief. Section 10(j) vests the Board with discretion in the first instance to petition the district court for "appropriate temporary relief or restraining order" upon the issuance of a complaint charging an unfair labor practice. The district court, after proper notice, can grant the Board "such temporary relief or restraining order as it deems *just and proper*." (Emphasis supplied.) However, the legislative history of Sections 10(j) and 10(l) does demonstrate that the question whether the district court acted properly in the exercise of its discretion must be determined by consideration of all the facts and circumstances underlying the unfair labor practice charge.

The motivation behind the enactment of Sections 10(j) and 10(l) can be found in the Senate Report No. 105 to the Labor

5. The *Sperry* case involved a Section 10 (l) proceeding. Since the statutory standard to be applied by the district court is substantially the same in Section 10(j) and 10(l) proceedings except when a temporary restraining order is issued ex parte *without notice* under Section 10(l), there is no valid reason for prescribing a different scope of review for a Section 10(j) proceeding.

Management Relations Act of 1947, which states in pertinent part:

> "Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices *until after substantial injury* has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to *restore or preserve the status quo pending litigation.*" (Emphasis supplied.) Senate Report No. 105 on S. 1126, 1 Legislative History of the Labor Management Relations Act, 1947 at 433.

■ In our view, as suggested by the quoted excerpt from the Senate Report, the district judge's discretion in granting temporary relief under Section 10(j) cannot be activated and motivated solely by a finding of "reasonable cause" to believe that a violation of the Act has occurred. More is required to guide his permissive range of discretion. Section 10(j) is reserved for a more serious and extraordinary set of circumstances where the unfair labor practices, unless contained, would have an adverse and deleterious effect on the rights of the aggrieved party which could not be remedied through the normal Board channels. In determining the propriety of injunctive relief the district court should be able to conclude with reasonable probability from the circumstances of each case that the remedial purpose of the Act would be frustrated unless immediate action is taken.[6] To hold otherwise and condition the granting of temporary relief solely on a determination of "reasonable cause" would effectively circumvent the normal N. L. R. B. processes established by the Act and muddle the proper allocation of administrative and judicial functions.

Courts have not established uniform or rigid guidelines for Section 10(j) cases. Rather they have resolved the question of the propriety of injunctive relief on the basis of the facts and circumstances peculiar to each case. While some courts have used language which, considered out of context, would indicate that a finding of "reasonable cause" alone is sufficient to grant injunctive relief, the force of such expressions is diminished when considered in light of the circumstances of the case, which clearly demonstrate that there existed a probability that the purposes of the Act would be frustrated without injunctive relief preserving and restoring the status quo. See, e. g., Local No. 83, Construction, etc., Drivers Union v. Jenkins, 308 F.2d 516 (9th Cir. 1962); McLeod v. Compressed Air, etc., Workers, 292 F.2d 358 (2d Cir. 1961).

We need not engage in a case-by-case discussion of the various factual patterns which other courts have deemed sufficient to warrant Section 10(j) relief. Our analysis of a number of these decisions convinces us that in each instance injunctive relief was necessary either to preserve the status quo or to prevent frustration of the basic remedial purpose of the Act. See, e. g., Angle v. Sacks,

---

6. As late as 1962 the present Chairman of the Board, Frank W. McCulloch, recognized that Section 10(j) should not be invoked in the absence of circumstances demonstrating the need for injunctive relief in order to proscribe conduct which would otherwise defeat the purposes of the the Act. In an address before the Eighth Annual Joint Industrial Relations Conference, Michigan State University, April 19, 1962, the Chairman of the Board stated that the Board has exercised its power to seek injunctions "not as a broad sword, but as a scalpel, ever mindful of the dangers inherent in conducting labor management relations by way of injunction." See McLeod for and on Behalf of N. L. R. B. v. General Electric Company, 366 F.2d 847, 849–850 (2d Cir. 1966).

382 F.2d 655 (10th Cir. 1967) (injunctive relief proper to restrain Company discharges calculated to destroy or severely inhibit employee interest in Union representation and collective bargaining); McLeod, for and on Behalf of N. L. R. B. v. Compressed Air, etc., Workers, supra, (injunction necessary to enjoin Union from striking to terminate an existing collective bargaining contract without first complying with the notice requirements of Section 8(d)); Brown, for and on Behalf of N. L. R. B. v. Pacific Telephone and Telegraph Company, 218 F.2d 542 (9th Cir. 1954) (injunction proper to prevent irreparable injury to three certified Unions by the drifting away of their members to the Union recognized by the Company); Reynolds, for and on Behalf of N. L. R. B. v. Curley Printing Company, 247 F.Supp. 317 (M.D.Tenn. 1965) (Section 10(j) relief warranted to prevent irreparable dissipation of support for Union by bindery employees as the result of Company intimidations); Rains, for and on Behalf of N. L. R. B. v. East Tennessee Packing Company, 240 F.Supp. 770 (E.D.Tenn.1965) (injunction required to enjoin Company's refusal to bargain with certified Union in favor of unaffiliated Union despite certification of the former as the exclusive collective bargaining agent by the Board); Lebus, for and on Behalf of N. L. R. B. v. Manning, Maxwell and Moore, Incorporated, 218 F.Supp. 702 (W.D.La.1963) (temporary injunction held proper to restrain Company from continuing to regulate employees' working conditions without bargaining with certified Union where such action tended to undermine Union's status and promote labor disputes).

We find ourselves in general agreement with the views set forth by the Tenth Circuit in Angle v. Sacks, supra, wherein the Court stated in defining the scope of Section 10(j) relief:

"We do think, however, that the legislative history indicates a standard in addition to the 'probable cause' finding that must be satisfied before a district court grants relief. The circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted. Administration of the Act is vested by Congress in the Board, and when the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless, temporary relief may be granted under section 10(j). Preservation and restoration of the status quo are then appropriate considerations in granting temporary relief pending determination of the issues by the Board." 382 F.2d at 660.

In an analogous factual situation the decision of the Second Circuit in McLeod, for and on Behalf of N. L. R. B. v. General Electric Company, 366 F.2d 847 (2d Cir. 1966), substantiates our conclusion. In that case, as here, the Regional Director of the N. L. R. B. had sought an injunction under Section 10(j) restraining GE from refusing to meet with the negotiating committee of the International Union of Electrical Workers, which included seven men affiliated with other unions representing GE. The district court granted the requested injunctive relief, not on the basis that its action was necessary to preserve the status quo or prevent irreparable harm, but upon the determination that GE's impact on national defense and the public interest was "grave enough to justify swifter corrective action than the normal process of Board adjudication and court enforcement." McLeod, for and on Behalf of N. L. R. B. v. General Electric Company, 257 F.Supp. 690, 708 (S.D.N.Y.1966).

On appeal the Second Circuit reversed outright and held that the circumstances of the General Electric case were insufficient to warrant injunctive relief pending resolution of the basic dispute by the Board. In vacating the temporary injunction the Court reaffirmed the extraordinary nature of the injunctive remedy:

" * * * The Board has not demonstrated that an injunction is necessary

to preserve the status quo or to prevent any irreparable harm. Moreover, the basic legal question underlying its conduct—the very same question presented in the *American Radiator* case, 155 N.L.R.B. No. 69 (1965) in which the Board did not see fit to seek an injunction—is a difficult one to resolve and one which no court has considered. It would be more in keeping with the scheme intended by Congress to have this case particularly because of its unusual characteristics, follow the path of Board hearing and decision on the unfair labor practice charges, rather than to shortcircuit the established administrative design." [7] 366 F.2d at 850.

■ In attempting to uphold the district court's action the Board contends that the propriety of injunctive relief turns not upon the presence of traditional equity criteria applicable to suits between private parties, but upon the necessity for effectuating a broader statutory policy embodied in Section 10(j). We agree with the Board's position that under appropriate circumstances, where the public interest is affected, ordinary, equitable standards governing private interests may not control the allocation of temporary injunctive relief. See, e. g., United States v. First National City Bank, 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Hecht Company v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Virginian Railway Co. v. System Federation No. 40, Railway Employees Dep't., 300 U.S. 515, 552, 57 S. Ct. 592, 81 L.Ed. 789 (1937). We believe, however, that the standard suggested by the Board is inappropriate as applied to the circumstances of this case. As we have already indicated, Section 10(j) reposes in the district court a broad range of discretionary action which is suffi-

ciently flexible to warrant use of the injunctive power in situations requiring interim and direct relief. Such, however, is not the case here.

The district judge in part predicated his order of injunctive relief upon a finding that the situation created by 3M's refusal to bargain posed a serious threat " 'upon the public interest * * * grave enough to justify swifter corrective action * * *' than the Board can mete." The problem with the district court's finding, however, is that the record is devoid of any evidence which would support it. The Board has utterly failed to present any factual data which would remotely suggest that the public interest is or may be affected by the alleged unfair labor practices.

Moreover, we find the district court's determination that the OCAW and its affiliated Locals will suffer irreparable harm unless relief is granted equally untenable in light of the record before us. The court based its finding of irreparable harm on the rationale that if it was ultimately determined that the Union had a right to the presence of temporary union representatives at its negotiating sessions, it would have been deprived of a clearly determined legal right, for which compensatory damages would have proved an inadequate redress. This reasoning can apply with equal force to other 8(a) (5) situations, where a union's right to compel the employer to bargain with it in good faith is ultimately vindicated through the regular Board channels. The record, however, refutes the contention that the OCAW would suffer irreparable consequences by the absence of other union advisors. Negotiations between the Union and 3M have culminated in successive collecting bargaining agreements for a period of almost two decades. All of these contracts have been realized without the presence of "outsiders" to ad-

7. On petition of the Board, Mr. Justice Harlan stayed the order of the Second Circuit pending action on a writ of certiorari filed by the Board. The writ of certiorari was granted, but subsequently a contract was executed by GE and the union. The United States Supreme Court then remanded the case for a determination of whether the issue had been mooted by execution of the contract. McLeod, for and on Behalf of N.L.R.B. v. General-Electric Co., 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967).

vise the Union. Only in recent months has the OCAW strenuously urged that it has been required to bargain on disadvantageous terms with the Company because of the absence of other union representatives. In view of the past history of acceptable contracts negotiated between 3M and the OCAW, we find it highly unlikely that the OCAW will sustain any injury in its bargaining position if it retains the present composition of its negotiating committee pending a determination on the merits of this labor dispute.

The district court also determined that injunctive relief was necessary to maintain the status quo. It concluded that by reason of the long history of amicable collective bargaining there existed a harmonious relationship between the parties and that:

"it might well be determined that the status quo which the court is called upon to preserve is that peaceable, desirable, continuing relationship and status which has lasted for so many years and that failure to grant the injunction for that for which there is reasonable cause to believe the union has a legal right, may disrupt the status quo in this sense."

No authority is cited to support the court's concept of status quo. We agree with 3M that the status quo consists of the bargaining position of the parties prior to the attempt by the OCAW to include representatives of other labor organizations as a part of its negotiating committee. The status quo here is the same as in McLeod for and on Behalf of N. L. R. B. v. General Electric Company, supra. See also Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); Westinghouse Electric Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7th Cir. 1958), where the Court stated that "a preliminary injunction is a provisional remedy designed to preserve the status quo until the case can be heard upon the merits. * * * The status quo is the last uncontested status which preceded the pending controversy."

In vacating the district court's temporary injunction we do not quarrel with its determination that there is "reasonable cause" to believe that 3M has violated Sections 8(a) (1) and (5). In light of the holding of the Sixth Circuit that an employer commits an unfair labor practice by refusing to meet and conduct bargaining negotiations in the presence of temporary union representatives, we cannot say that the district court's finding of "reasonable cause" is clearly erroneous. Standard Oil Company v. N. L. R. B., 322 F.2d 40 (6th Cir. 1963); See also American Radiator & Standard Sanitary Corporation v. N. L. R. B., 381 F.2d 632 (6th Cir. 1967) (dictum). The merits of these decisions, however, were determined through the normal Board proceedings, subject to court review under Section 10(f) of the Act, and while they may suggest that 3M has violated Section 8(a) (5), they do not indicate that the issue common to all these cases is of such compelling significance as to warrant court intervention.

A careful analysis of the record convinces us that this case presents nothing more than a showing of "reasonable cause" to believe the Act was violated. Irrespective of the standard by which we gauge the propriety of the restraining order, whether it be irreparable harm or conservation of the public interest, we nonetheless do not believe this to be the type of situation that calls for injunctive relief. Accordingly, we reverse the order granting the temporary injunction and remand the cause with direction to vacate the injunction. We intimate no opinion, however, as to the ultimate merits of this controversy. That function must be relegated in the first instance to the Board.