David C. SACHS, acting Regional Director of the Fifth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD

v.

DAVIS & HEMPHILL, INC.

Civ. No. 20292.

United States District Court
D. Maryland.

Jan. 24, 1969.

Walter H. Maloney, Jr. and John L. Kluttz, Attys., N. L. R. B., Fifth Region, Baltimore, Md. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Henry L. Segal, Asst. Regional Atty., and David C. Sachs, Acting Regional Director, Fifth Region, Baltimore, Md., on the brief), for petitioner.

Jacob Blum and Blum, Yumkas & Mailman, Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

The petition in this case was filed by the Acting Regional Director of the Fifth Region of the National Labor Relations Board (the Board), for and on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations Act, as amended, 61 Stat. 149; 73 Stat. 544; 29 U.S.C. Sec. 160(j) (the Act), seeking a temporary injunction pending the final disposition of the matters involved herein now before the Board. Respondent filed an answer, and an evidentiary hearing was held on January 14, 1969. Upon the entire record, the Court makes the following:

*Findings of Fact*

Respondent, Davis & Hemphill, Inc. (the employer), is engaged at Elkridge,

Maryland, in the manufacture and sale of screws, and is engaged in commerce within the meaning of Sections 2(6) and (7) of the Act. District 12 of the International Association of Machinists and Aerospace Workers, AFL–CIO (the Union) is a labor organization, organized in whole or in part for the purpose of representing employees in negotiations over wages, hours, and terms and conditions of employment.

On June 30, 1967, the Board conducted a secret ballot election in a bargaining unit composed of all production and maintenance employees of respondent at its Elkridge plant, including inspectors, but excluding all office clerical employees, professional employees, guards and supervisors, as defined in the Act.[1] The Union won that election by a vote of 74 to 44, and on July 11, 1967, was certified as the exclusive bargaining representative of the employees in that unit.

The parties bargained until late in the fall when they concluded a collective bargaining agreement of one year's duration, extending from November 15, 1967, to November 14, 1968. The agreement did not contain a union security clause, but did contain a provision enabling but not requiring employees to have their union dues deducted monthly from their paychecks. Employees who signed written check-off authorizations had a $5 dues payment deducted from their first paycheck each month. Employees who executed such authorizations could not revoke them until the expiration of the contract on November 14, 1968. A few members elected to pay dues directly to the Union by making a monthly payment to the shop steward.

On September 9, 1968, a little more than two months before expiration of the agreement, the Union sent a letter to Sherwood Balderson, respondent's president, notifying respondent that the Union desired to modify the agreement, and requesting a date for the commencement of bargaining. By letter of September 12, Balderson replied that respondent desired to terminate the agreement upon its expiration date, stating: "The Company has reason to believe that the Union no longer represents a majority of the eligible employees." On October 28, Patrick O'Brien, the Union's District Representative, telephoned Balderson and requested a meeting for purposes of bargaining. Balderson referred O'Brien to respondent's counsel, Jacob Blum, who declined to meet O'Brien on the ground that respondent doubted the Union's majority status. Early in November, respondent posted a notice on its employee bulletin board, informing employees that they could withdraw their check-off authorizations between November 15 and November 24 by sending a registered letter to the Union and a copy to the Company. No such letters were received.

On November 14, respondent's employees who were members of the Union voted 55 to 1 to strike because respondent had refused to bargain. A strike began the following morning and still continues. On November 15, O'Brien met with Balderson inside respondent's plant to discuss certain strike ground rules. O'Brien again requested respondent to bargain, telling Balderson that the Union would call off the strike if the Company would sit down and negotiate a new contract. Again Balderson declined.

By mutual agreement, only supervisory and office clerical employees reported to work on November 15 through November 18. On November 21, respondent sent each of its striking employees a letter, telling them to return to work by November 25 or the Company would take immediate steps to hire replacements. On November 25 only 20–25 percent of the employees in the bargaining unit returned to work. That figure has now increased to 40–45 percent, including some ten persons hired as replacements after the strike began. The employer has advertised for replacements, and has stated that it will hire 100% replacements if qualified persons apply.

---

1. In a similar election a year or so earlier, the vote had been for no Union.

Balderson testified that his belief on September 12 and thereafter that the Union no longer represented a majority of the employees was based on (1) reports of dissatisfaction he received during the year from his foremen, (2) his personal contact with employees, (3) the number of employees who had signed check-off authorizations, and (4) a list of over 50 people indicating over 100 instances of dissatisfaction which was prepared by his foremen after the Union's letter of September 9 requesting bargaining.

There had been some complaints about the Union to supervisory employers, and some complaints about the way the check-off was handled; but no documentation of the number or nature of the complaints was offered in evidence, and no adequate documentation existed. Balderson knew of no statements by employees that they wished to withdraw their membership in the Union or that they wished to withdraw their choice of the Union as the bargaining agent of the unit. There is no evidence that any employee tried to file a decertification petition or inquired how that might be done. Nor did respondent petition the Board for an election.

More employees in the bargaining unit had voted for the Union than ever joined the Union, but the Court finds that at all material times a majority of the employees were members of the Union. Although the vote had been 74 to 44 in favor of the Union, only 32% of the employees in the bargaining unit signed check-off forms during the first month of the contract. A slowly increasing number signed check-off forms thereafter, and by March about half of the employees had signed such forms. There was some turnover in employees, but the percentage of employees who had signed check-off forms remained near 50% through September 12 and until the end of the contract year. Respondent had an anti-union bias, which influenced its decision to refuse to bargain with the Union. The credible evidence offered in this case shows that the complaints by employees were not sufficient in number or seriousness to form an adequate factual basis for a belief that a majority of the employees in the bargaining unit did not still want the Union to represent them, or to create a reasonable doubt in the minds of respondent's president on that question.

### Discussion

The standards governing the application of § 10(j) have not yet been passed upon by the Supreme Court.

An appeal from the denial of an injunction sought under § 10(j) came before the Fourth Circuit in Johnston v. J. P. Stevens & Co., 341 F.2d 891 (4 Cir. 1965). In a cautious per curiam opinion the Court said:

" * * * the [district] court recognized the correct rule, that 'Because of the sometimes slow procedure before the Board, Congress gave the Board the power, in the public interest, to seek injunctive relief * * * to prevent persons who are violating the Act from accomplishing their unlawful purpose because of delays before the Board.' It further recognized that the law's purpose is to preserve the status quo, and that the court is obliged to issue an appropriate injunctive order upon a finding of reasonable cause to believe that unfair labor practices had been committed and that injunctive relief is just and proper. While observing the limits of the court's power and acknowledging that the final determination of whether the Act has been violated is for the Board, not for the court, the court still felt obliged to appraise the proof submitted to it, at least to the extent of determining whether there is reasonable cause for an interlocutory injunction, as provided by the statute. The court stated its conclusion as follows:

'This Court is not satisfied on the basis of the equivocal and unclear showing made by the record before it that an injunction is "just and proper" to carry out the purposes of the National Labor Relations Act.'

"Upon consideration of the circumstances, we cannot say that the court is clearly erroneous in this finding or in its conclusion of law.

"We are also advertent to the practicalities of the situation. The conduct complained of began a year and a half ago; the Board proceedings have been pending for over a year. A remand now to the District Court, as the Board urges, would contribute little to the effectiveness of the Act's enforcement. The Board has it within its power to advance the determination of the issues on the merits." 341 F.2d at 892, 893.

There has been no such delay in the instant case. The employer first refused to bargain on September 12, 1968. The Union filed its complaint with the Labor Board on October 30. The strike began on November 15, immediately after the termination of the existing agreement. A hearing before a Board examiner was held on December 19–20. This action was filed on January 6, 1969. The normal procedures before the Labor Board, including briefs, etc., will require several more months at least, in addition to the time required for any enforcement proceedings.

Since the decision of the Fourth Circuit in Johnston v. J. P. Stevens & Co., there have been several appellate opinions which have discussed in considerable detail the standards which should be applied in § 10(j) cases.

McLeod v. General Electric Co. arose in the Southern District of New York. The facts were quite different from the facts in this case, but the several opinions are instructive. The District Court applied a dual test: (1) whether "the impact upon the public interest is grave enough to justify swifter corrective action than the normal process of Board adjudication and court enforcement," 257 F.Supp. 690, 708, and (2) "whether the Board has 'reasonable cause to believe' that the accused party has been guilty of unfair labor practices." 257 F.Supp. at 709. The District Court granted an injunction.

The Second Circuit reversed. It considered the proper standard to be whether the Board had "demonstrated that an injunction is necessary to preserve the status quo or to prevent any irreparable harm." 366 F.2d 847 at 850.

Mr. Justice Harlan granted a stay of the judgment of the Court of Appeals pending the Supreme Court's disposition of the petition for certiorari filed by the Regional Director. He said that "the competing equities relevant to this application seem to me to tip in favor of some interim relief being granted at this stage." 87 S.Ct. 5, 17 L.Ed.2d 45. Before the Supreme Court ruled on the petition for certiorari, the company and IUE agreed upon a three-year collective bargaining agreement to replace the expired contract. The Supreme Court therefore concluded that it was not appropriate "to decide at this time the proper construction of § 10(j)." It dissolved the stay granted by Mr. Justice Harlan and set aside the judgment of the Court of Appeals with direction to enter a new judgment setting aside the order of the District Court and "remanding to that court for such further proceedings as may be appropriate in light of the supervening event." 385 U.S. 533, 535, 87 S.Ct. 637; 639, 17 L.Ed.2d 588 (1967).

In Angle v. Sacks, 382 F.2d 655 (10 Cir. 1967), the Court discussed at some length the standards which should be applied in § 10(j) cases. The Court said:

"We find nothing in the legislative history of section 10(j) declaring or suggesting that the Board's discretion in seeking section 10(j) relief should be limited to those emergencies endangering the national welfare, or to situations with 'heavy and meaningful repercussions,' or to situations that have a demonstrably prejudicial impact on the public. The concern of Congress was rather that the purposes of the National Labor Relations Act could be defeated in particlular cases by the passage of time." 382 F.2d at 659.

After a long quotation from Senate Report No. 105, 80th Cong., 1st Sess. 8, 27 (1947), the Court said:

"In our view, the foregoing excerpts indicate that Congress imposed no readily identifiable limitation on the *Board's* discretion to *seek* temporary relief under section 10(j); the Board may seek relief if the 'circumstances call for such relief.'

"We do think, however, that the legislative history indicates a standard in addition to the 'probable cause' finding that must be satisfied before a district court grants relief. The circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted. Administration of the Act is vested by Congress in the Board, and when the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless, temporary relief may be granted under section 10(j). Preservation and restoration of the status quo are then appropriate considerations in granting temporary relief pending determination of the issues by the Board. See, e. g., Johnston v. J. P. Stevens & Co., 341 F.2d 891 (4th Cir.); [other citations omitted].

"Prescribing standards or guidelines is helpful, but standards are given substance only as they are applied to the facts and circumstances of a particular case. We conclude that the circumstances of the case at bar were sufficient to raise a reasonable apprehension that the purposes of the Act could be defeated if temporary relief were not granted under section 10 (j)." 382 F.2d at 660.

In Minnesota Mining and Manufacturing Co. v. Meter, 385 F.2d 265 (8 Cir. 1967), the Court noted that the statute itself provides little assistance in determining what standards are to be applied, since it lays down no definitive guidelines for the imposition of injunctive relief. 385 F.2d at 269. After quoting from the same Senate Report considered in Angle v. Sacks, supra, the Court said:

"In our view, as suggested by the quoted excerpt from the Senate Report, the district judge's discretion in granting temporary relief under Section 10(j) cannot be activated and motivated solely by a finding of 'reasonable cause' to believe that a violation of the Act has occurred. More is required to guide his permissive range of discretion. Section 10(j) is reserved for a more serious and extraordinary set of circumstances where the unfair labor practices, unless contained, would have an adverse and deleterious effect on the rights of the aggrieved party which could not be remedied through the normal Board channels. In determining the propriety of injunctive relief the district court should be able to conclude with reasonable probability from the circumstances of each case that the remedial purpose of the Act would be frustrated unless immediate action is taken. To hold otherwise and condition the granting of temporary relief solely on a determination of 'reasonable cause' would effectively circumvent the normal N.L.R.B. processes established by the Act and muddle the proper allocation of administrative and judicial functions." 385 F.2d at 270.

The Court then analyzed briefly a number of earlier cases, and said: "We find ourselves in general agreement with the views set forth by the Tenth Circuit in Angle v. Sacks * * *," in the last paragraph quoted herein from that opinion.

The Eighth Circuit found that the status quo in the *3M* case was the same as in McLeod v. General Electric Co., supra. The facts in the *3M* case were similar to the facts in the *General Electric* case, and different from the facts in this case. More appropriate here is the

statement in Westinghouse Electric Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7 Cir. 1958), also quoted in *3M*, 385 F.2d at 273, that "a preliminary injunction is a provisional remedy designed to preserve the status quo until the case can be heard upon the merits. * * * The status quo is the last uncontested status which preceded the pending controversy."

The Eighth Circuit found in the *3M* case that the facts presented "nothing more than a showing of 'reasonable cause' to believe the Act was violated," and that "[i]rrespective of the standard by which we gauge the propriety of the restraining order, whether it be irreparable harm or conservation of the public interest, we nonetheless do not believe this to be the type of situation that calls for injunctive relief." 385 F.2d at 273.

■ After considering all these authorities, this Court concludes that it must consider two questions: (1) Whether plaintiff herein has proved that there existed at the time this suit was filed reasonable cause to believe that defendant had engaged in or was engaging in an unfair labor practice; and (2) Whether it would be just and proper to issue the proposed injunction.

■ (1) Whether there is reasonable cause to believe that an employer has engaged or is engaging in an unfair labor practice at any specified time does not require proof that the Union actually had a majority on the date in question; it is sufficient for the Regional Director to prove that the employer's expressed doubt that the bargaining unit majority still wished to be represented by the Union was not supported by a reasonable basis. As Judge Tuttle said in N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588 (5 Cir. 1966):

"It is well settled that in the absence of special circumstances a union's majority status is irrebuttably presumed for a period of one year following the union's certification by the Board as collective bargaining agent. We think it is also true that upon the expiration of the certification year, the presumption of majority status continues but becomes rebuttable even in the absence of special circumstances. In the light of the Supreme Court's recognition in Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, that the Board's policies with respect to the handling of decertification procedures are to be given great weight so long as they appear to be within the Congressional policy, and because of the Court's citation of Celanese Corporation of America, 95 NLRB 664, we think it can be fairly stated that any doubt as to the continuing majority status must rest on a reasonable basis and may not depend solely upon unfounded speculation or a subjective state of mind." 362 F.2d at 589.

See also Celanese Corporation of America, 95 N.L.R.B. 664 (1951); Convair Division, 169 N.L.R.B. No. 26 (Jan. 12, 1968).

■ (2) Whether it would be just and proper to issue the proposed injunction in this case turns on whether there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted. See Angle v. Sacks, supra, particularly the passage quoted with approval in the *3M* case, 385 F.2d at 271.

The status quo in this case is not the status at the time the application for an injunction was filed. Rather, it is the status just before September 12, 1968, when this controversy arose. At that time the Union represented the employees. The employer's refusal to bargain has been continuing, through November 15, 1968, when the existing agreement expired and the Union went on strike, until the present.

*Ultimate Findings of Fact and Conclusions of Law*

■ 1. The Court has found as a fact from the credible evidence produced in this case and discussed in the latter part of the Findings of Fact, above, that respondent did not have a reasonable basis for his expressed doubt. His claim-

ed doubt was not based on sufficient factual information or objective criteria to overcome the presumption of the Union's continuing majority status; instead, it was based on unfounded speculation, anti-union bias and wishful thinking.

Therefore, the Court finds that there existed at the time this suit was filed reasonable cause to believe that defendant had engaged in and was engaging in an unfair labor practice, and that there is reasonable cause to believe that defendant is still engaging in such a practice.

If it were necessary, the Court would find as a fact that petitioner has proved by the weight of the credible evidence produced in this case that as of October 30, 1968, respondent had engaged in and was engaging in an unfair labor practice, and that respondent is still engaging in such a practice today.[2]

2. The Court finds that the purposes of the Act will be frustrated if the temporary injunction sought by the Regional Director is not granted. The Act was intended to promote industrial peace by encouraging collective bargaining as a substitute for industrial strife. The public has a stake in this result, and that stake must be considered in determining whether a temporary injunction is just and proper. Employees have the right to choose freely whether or not they wish to be represented by a union, without being subjected to pressures arising from unfair labor practices on the part of the employer. If respondent is permitted to continue its refusal to bargain until the Board decides the issues pending before it, respondent will be able to wear down the support for the Union, which existed during the fall of 1968. That support was evidenced by the 74 to 44 vote in July 1967, is presumed to continue, and has not been shown by respondent to have been dissipated before

respondent embarked upon its unjustified refusal to bargain. If the temporary relief is not granted, the delays inherent in the Labor Board proceeding will enable respondent to continue its unjustified refusal to bargain for such a long time that the normal procedures provided by the Act, apart from § 10(j), will not afford its employees and the Union an adequate remedy. The public interest requires that the purposes of the Act be not frustrated in this way.

It is just and proper to issue the requested injunction.[3]

---

2. The Labor Board, of course, will decide the appropriate questions on the basis of the evidence produced before it, and should not be influenced by the findings made by this Court.

3. Other more or less formal conclusions of law have been filed.