Bernard LEVINE, Regional Director for Region 8 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,

v.

C & W MINING CO., INC. and/or C & W Hauling Company, Inc., Respondent-Appellant.

No. 79–3229.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1979.

Decided Dec. 11, 1979.

Rehearing and Rehearing En Banc Denied Feb. 25, 1980.

Sheldon R. Jaffery, Zellmer & Gruber, Maxwell J. Gruber, Joyce L. Koontz, Cleveland, Ohio, John Orr Beck, Lisbon, Ohio, for respondent-appellant.

Joseph E. Mayer, John W. Hornbeck, N.L.R.B., Washington, D. C., B. Patricia Dyson, John Kollar, Cleveland, Ohio, for petitioner-appellee.

Before LIVELY and MERRITT, Circuit Judges, and PECK, Senior Circuit Judge.

LIVELY, Circuit Judge.

In this labor case we review a temporary injunction issued by the district court pending a final decision by the National Labor Relations Board (NLRB or Board) in pending unfair labor practice proceedings. The injunction was issued pursuant to section 10(j) of the Labor Management Relations Act, 1947, as amended (The Act), 29 U.S.C. § 160(j), which provides:

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

C & W Mining Co. (C & W) is engaged in strip mining coal at three locations near

Lisbon, Ohio. In late September 1978 a dispute broke out between C & W[1] and truck drivers employed by it to haul coal from its mines to its customers. When C & W refused to negotiate with a representative of the Fraternal Association of Special Haulers, Local 100 (FASH), 20 of the 24 truck drivers employed by C & W went out on strike. On October 6, 1978 the striking drivers returned to work, after a series of confrontations between various officers of C & W and the drivers. On the same day FASH filed a charge with the NLRB alleging that C & W had engaged in, and was engaging in, unfair labor practices as defined in the Act. The union subsequently filed two amended charges of unfair labor practices. Later in October C & W advertised its trucks for sale, and two were sold. One of the more senior drivers was discharged and C & W began contracting with independent truckers to haul some of its coal, causing the earnings of a number of its drivers, who were paid on a tonnage basis, to drop.

On January 3, 1979 the General Counsel of the NLRB issued a formal complaint and notice of hearing on the charges of unfair labor practices. On January 4, 1979 the regional director of the NLRB filed a petition in the district court seeking "appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board. . . ." The petition stated that the regional director had reasonable cause to believe C & W had engaged in a number of unfair labor practices which were enumerated and described in detail. It also stated that important purposes of the Act would be frustrated if C & W were not restrained prior to a determination by the Board and enforcement of its orders pursuant to regular proceedings.

The district court conducted a hearing on the petition on January 19, 1979. Four witnesses testified and an affidavit of the president and sole stockholder of C & W was admitted in evidence. Thereafter the

district judge filed an opinion in which he found that an appropriate bargaining unit consisted of all truck drivers employed by C & W at Lisbon and that at least 16 of the 24 drivers had signed authorization cards which "unambiguously declared" their selection of FASH as their exclusive collective bargaining representative. After stating that C & W refused to recognize FASH for purposes of collective bargaining "beginning October 1, 1978 and every subsequent day," the opinion continued:

> Beginning on October 1, 1978 and continuing to the present day, the Company has engaged in many actions designed to destroy the majority status of the Union and discourage the truck drivers from attempting in the future to bring any other outside union into the Company. These actions include: threats of business closure; interrogation of employees concerning union membership, activities, and sympathies; numerous declarations that the Company would never recognize a union; threats of discharge from employment because of union activities; promise and grant of benefits to persuade employees to abandon the Union and any future attempt to unionize; direct dealing with the employees to discourage unionization; the sale of trucks and threats of the sale of trucks, which would result in loss of employment, in reaction to the union-organizing activities; solicitation of grievances by the Company to discourage union activities; giving the appearance of surveillance over the employees' union activities; formation of an unnamed employee committee to supplant the outside Union, and domination or financial support of this committee; apparent discharge of employees who were leaders in the organization of the union at the Company; reprisals, such as assignment to more arduous work or sale of trucks, against certain employees because of their leadership in the union-organizing

---

1. Though C & W Mining Co. had formed a wholly-owned subsidiary, C & W Hauling Company, Inc., to haul coal from its mines, the district court found that the drivers remained employees of C & W Mining Co. at all times pertinent to this case. The record supports this finding.

activities; coercion to persuade employees to abandon the Union; and refusal to bargain with the Union on matters of pay, hours, conditions of employment or the sale, or advertising for sale, of trucks.

The district judge found that the actions of C & W resulted in the strike's being broken and the union's majority being dissipated within one week from the initial demand by FASH for recognition. He further found that C & W had continued "to take action to insure that the truck drivers will never again attempt to organize into a union." The action referred to was the sale of two trucks and ongoing attempts to sell the rest. Finding that there was reasonable cause to believe C & W had violated sections 8(a)(1), (2), (3) and (5) of the Act, the court further determined that the issuance of an injunction was just and proper. The order which the district court entered enjoined C & W from engaging in a specified list of actions found by the court to be unfair labor practices and from any other actions which violated the Act. C & W was specifically enjoined from selling trucks except as part of an agreement with FASH. Finally, C & W was directed to bargain with FASH as exclusive representative of its truck drivers.

■ The sole standard for issuance of a temporary injunction pursuant to section 10(j) is contained in the requirement that the court to which the petition is addressed grant such temporary relief "as it deems just and proper." Thus it is a matter committed to judicial discretion. Before determining to grant relief, however, the court must find that there is reasonable cause to believe that unfair labor practices have been committed. The "reasonable cause" requirement is stated explicitly in section 10(*l*) [2] of the Act, but has been held consistently to be a requirement for a section 10(j) injunction as well. *Seeler v. Trading Post, Inc.,* 517 F.2d 33 (2d Cir. 1975); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185 (5th Cir. 1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Minnesota Mining & Manufacturing Co. v. Meter,* 385 F.2d 265 (8th Cir. 1967); *Angle v. Sacks,* 382 F.2d 655 (10th Cir. 1967). This court held in *American Federation of Radio & Television Artists v. Getreu,* 258 F.2d 698, 699 (6th Cir. 1958), that its review of an order granting an injunction in a section 10(*l*) case "is further confined . . . to determining whether the district court's finding of reasonable cause was clearly erroneous." *See also, Hirsch v. Building & Construction Trades Council,* 530 F.2d 298, 303 (3d Cir. 1976). Other courts agree that this is also the proper standard for review of this facet of a section 10(j) case. (citations, supra).

■ C & W has not seriously argued that the finding of reasonable cause was clearly erroneous. In its brief it presented a statement of facts, which if accepted by the district court, would have supported a finding of no reasonable cause. When closely scrutinized the arguments of C & W claim nothing more than that there was a conflict in the evidence. This does not address the question of whether there was substantial evidence on the other side. However, examination of the record on appeal reveals an abundance of evidence from which the reasonable cause determination could have been made. The regional director was not required to prove the commission of unfair labor practices; that is a determination finally to be made by the Board pursuant to its regular procedures. As the court said in *Hirsch v. Building & Construction Trades Council, supra,* 530 F.2d at 302, the burden of proof on the regional director is relatively insubstantial when he seeks a temporary injunction. We conclude that the petitioner met this burden in the present case and that the reasonable cause finding is not clearly erroneous.

The more serious arguments on behalf of C & W relate to the remedy chosen by the district court. It asserts that no injunction should have issued because the acts complained of occurred during a very brief period and there was no evidence of ongoing unfair labor practices. With respect to spe-

2. Section 10(*l*) provides for injunctions against secondary boycotts.

cific provisions of the injunction, C & W contends that an interim bargaining order should not issue in a section 10(j) action prior to certification of the union by the NLRB, and that the injunction against selling trucks constitutes an unwarranted interference in business decisions. It argues that these two provisions of the injunction are not "just and proper" relief.

■ Dealing with C & W's appellate arguments in order, we consider first the contention that it was error to grant an injunction because there was no showing that the unfair labor practices were continuing. The short answer to this argument is that the anti-union campaign was so effective that the movement was quickly stifled. The strike was broken in a few days and the employees began dealing with C & W through an internal "committee." There was no need for C & W to continue the campaign. In some cases, where employees are more tenacious or a company's first responses to recognition demands are less effective, the question of whether unfair labor practices are continuing may be a material consideration in a section 10(j) proceeding. Under the circumstances of this case, the continuation of unfair labor practices was not a prerequisite for temporary relief.

■ The second argument of C & W, if adopted, would eliminate section 10(j) as a remedy in every situation where a union is seeking recognition on the basis of authorization cards. There is no such limitation in the statute itself, and the courts have granted section 10(j) relief in pre-election situations, and even when a union has lost a Board-conducted election. *E. g., Angle v. Sacks, supra; Seeler v. Trading Post, Inc., supra; contra, Boire v. Pilot Carriers, Inc., supra.* The court in *Seeler* concisely stated its holding as follows:

> We hold only that when the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible,

the district court should issue a bargaining order under § 10(j). In such a case the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practice status quo and preventing further frustration of the purposes of the Act.

517 F.2d at 40.

The Supreme Court has approved issuance of interim bargaining orders by the NLRB upon a finding of "flagrant" or "egregious" unfair labor practices and where unfair labor practices, though not "outrageous" or "pervasive," *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 613, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), " . . . nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940. In situations where an ultimate determination in favor of a union would be meaningless because of the success of unfair labor practices a district court may grant temporary relief including an interim bargaining order.

■ The legislative history of the Act makes clear that section 10(j) was added to give the Board a means of preserving the status quo pending the completion of its regular procedures. The Senate report contains this explanation of sections 10(j) and (*l*):

> Sections 10(j), (k), and (*l*): These subsections are additions to section 10.

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not

self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.

In subsections (j) and (*l*) to section 10 the Board is given additional authority to seek injunctive relief. By section 10(j), the Board is authorized, after it has issued a complaint alleging the commission of unfair labor practices by either an employer or a labor organization or its agent, to petition the appropriate district court for temporary relief or restraining order. Thus the Board need not wait, if the circumstances call for such relief, until it has held a hearing, issued its order, and petitioned for enforcement of its order.

S.Rep. No. 105, 80th Cong., 1st Sess., 27 (1947), reprinted in I Legislative History of the Labor Management Relations Act, 1947, 433 (1948).

The courts have split on the definition of the status quo which is to be preserved or restored. The Fifth and Eighth Circuits have determined that when there has been no prior bargaining relationship and a union relies on authorization cards where no election has been held, the status quo to be preserved "is the last uncontested status which preceded the pending controversy." *Boire v. Pilot Freight Carriers, Inc., supra,* 515 F.2d at 1194, quoting *Minnesota Mining & Manufacturing Co. v. Meter, supra,* 385 F.2d at 273. On the other hand, the Second and Tenth Circuits have held that the status quo which is to be preserved or restored is that which existed immediately prior to the commission of unfair labor practices, not that which came into being as a result of the very acts being litigated. *Seeler v. Trading Post, Inc., supra; Angle v. Sacks, supra.*

Under the Fifth Circuit rule the controversy is deemed to have been precipitated by the activities of the union in seeking signatures on authorization cards. Under the Second Circuit rule the union is given the benefit of the sign-up period. The Second Circuit rule appears to be more in accord with the purposes of the Act. The purposes of the Act may be frustrated and a final order of the NLRB rendered meaningless by illegal acts of one of the parties pending the outcome of Board proceedings. This is the danger which section 10(j) was designed to prevent. In the absence of unfair labor practices on its part, a union's attempts to obtain authorization card signatures does not interfere with the orderly processing of labor-management controversies. On the other hand, unfair labor practices which are found sufficiently serious as to tend to undermine majority strength and impede the election process do threaten to frustrate national labor policy. Upon finding reasonable cause to believe that unfair labor practices have occurred a district court may grant injunctive relief, including an interim bargaining order, upon a further finding that, at some point, a union had majority support which the unfair labor practices threatened to erode during the normal process of Board determination and court enforcement.

Congress recognized that delay is inherent in the procedures which it prescribed for settling labor disputes. That delay was cited as the reason for enacting sections 10(j) and 10(*l*). Nevertheless, the Board should always seek to minimize the delay, especially when pre-election bargaining orders are obtained. This requires the Board to expedite its administrative action after obtaining a temporary injunction. If this is not done, as the court stated in *Eisenberg v. Hartz Mountain Corp.,* 519 F.2d 138, 144 (3d Cir. 1975), "[o]therwise, a temporary injunction, entered without reaching the ultimate merits of a dispute may become, in effect, a final disposition of the controversy."

Though we conclude that the provisions of the order prohibiting specified unfair labor practices and requiring interim bargaining were "just and proper" temporary remedies, the provision prohibiting sale of trucks requires somewhat different consideration. We conclude that this was an issue better left for Board determination. The

testimony on behalf of C & W was that it intended to return to its previous practice of contracting with outside truckers to haul its coal. It was claimed that C & W had sustained serious financial losses in the operation of its own trucks and that sale of the trucks had been under consideration prior to the beginning of the union's organizational activities. The district court discounted this testimony and concluded that the sale of the trucks was a continuation of the campaign of unfair labor practices.

An employer has no absolute duty to continue in business. The question of whether an employer is required to negotiate with a union on a *decision* to discontinue operations or subcontract work, as opposed to the *effects* of such a move on its employees, is to be decided on the facts of each case. *N.L.R.B. v. Acme Industrial Products, Inc.,* 439 F.2d 40 (6th Cir. 1971). We believe determination of this matter should be made as part of the full consideration of all issues between C & W and the union in regular Board proceedings. Even after such consideration, orders involving management decisions based on economic factors aside from labor policy are often given particularly close scrutiny in enforcement proceedings. *See, e. g., N.L.R.B. v. Townhouse T. V. & Appliances, Inc.,* 531 F.2d 826 (7th Cir. 1976); *N.L.R.B. v. Major,* 296 F.2d 466 (7th Cir. 1961); *N.L.R.B. v. American Manufacturing Co.,* 351 F.2d 74 (5th Cir. 1965).

As Justice (then Judge) Stewart did in *American Federation of Radio & Television Artists v. Getreu, supra,* 258 F.2d at 701, we emphasize the fact that there has not been a resolution of the merits of the controversy, and our affirmance of the temporary injunction does not mean that we adopt or approve all the findings and conclusions of the district court. Rather, we have concluded that the "reasonable cause" finding was not clearly erroneous, and that the remedial order, to the extent here approved, was just and proper.

The order granting a temporary injunction is affirmed in all respects except for the provisions prohibiting C & W from advertising for sale or selling its trucks and requiring it to bargain collectively with the union concerning sale of the trucks. These provisions of the order are vacated and set aside.

C & W will pay costs on appeal.