**James S. SCOTT, Director of the Thirty–Second Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellant,**

**v.**

**STEPHEN DUNN & ASSOCIATES, Respondent–Appellee.**

No. 00–15416.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 2000

Filed Feb. 2, 2001

---

Aaron N. Karsh, Judith I. Katz and Ellen A. Farrell, National Labor Relations

Board, Washington, D.C., for the petitioner-appellant.

Harry Lewis, Richard J. Curiale, Carmen Plaza de Jennings, and Sarah L. Harpham, Curiale, Dellaverson, Hirshchfeld, Kelly & Kramer, LLP, San Francisco, California, for the respondent-appellee.

Arthur Krantz, Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar, LLP, Oakland, California, for Amicus Curiae International Longshore and Warehouse Union Local 6.

Before: SCHROEDER, Chief Judge, SNEED and PAEZ, Circuit Judges.

Opinion by Judge PAEZ; Dissent by Judge SNEED

PAEZ, Circuit Judge:

The Regional Director of the National Labor Relations Board appeals the district court's refusal to enter an interim bargaining order pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) ("NLRA"). The Regional Director contends that the district court abused its discretion in finding that (1) the Union did not have the support of a majority of the employees of Stephen Dunn & Associates ("SD & A") prior to the employer's commission of numerous unfair labor practices; (2) the full Board is not likely to issue a bargaining order upon conclusion of the underlying administrative proceeding; and (3) the balance of hardships does not favor issuing the requested equitable relief.

In considering this appeal, we are mindful that the purpose of a section 10(j) injunction is to preserve the authority of the National Labor Relations Board ("Board") pending final administrative adjudication.

If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective.

*Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37–38 (2d Cir.1975). Additionally, we have explained that "the public interest is an important factor in the exercise of equitable discretion.... In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449, 460 (9th Cir.1994) (en banc). Guided by these principles, we find that the district court applied the wrong legal standard under our decision in *Miller* and that the balance of the hardships tips in favor of the Regional Director. Therefore, we reverse and direct the district court to enter an interim bargaining order.

I

SD & A is a California corporation engaged in telemarketing and telefundraising activities. It operates a facility located in Berkeley, California. Most of the 97 nonmanagerial employees at the Berkeley location work as callers who solicit donations from people they contact by telephone on behalf of SD & A's client organizations. Other employees work as verifiers who confirm the donations solicited by the callers or monitors who listen in on fundraising calls in order to rate the caller's performance. SD & A also employs four data processors.

Harlan Cross, an employee of SD & A, was dissatisfied with the pay and benefits offered by the company. Cross had heard that the employees of one of SD & A's competitors were represented by a union.

In January 1999, after discussing with "about 15 or 20 of his coworkers" his concerns about working conditions and unionization, Cross contacted Jerome Martin, an organizer for the International Longshore and Warehouse Union, Local 6 ("ILWU" or "Union").

The employees of SD & A held their first union organizing meeting on January 28, 1999. Shortly thereafter, the employees formed an "organizing committee" that ranged from six to fourteen SD & A workers. This committee had the primary responsibility for soliciting union authorization cards from their coworkers.

Throughout the organizing campaign, SD & A vigorously contested the Union's efforts to represent its employees. In fact, the company's antiunion campaign began within a week of the Union's first organizing meeting. In an effort to dissuade employees from joining the Union, SD & A held weekly "captive audience" meetings from early February 1999, through the date of the election.[1] The presentations made at these meetings were the basis for many of the unfair labor practices alleged by the Regional Director. The uncontradicted record establishes, and the district court found, that at these meetings, SD & A management

(1) "threaten[ed] employees with more onerous working conditions if the [U]nion became their representative;"

(2) "impliedly promise[d] to remedy employee work complaints if they voted against representation;"

(3) and "impliedly promise[d] to increase benefits if the employees voted against Union representation."

In addition to these weekly meetings, the company also engaged in more serious antiunion behavior. First, SD & A attempted to "pack" the bargaining unit and dilute the strength of the pro-union majority by rapidly hiring additional unneeded employees, including 24 in the month before the cutoff date for voting eligibility.[2] Second, SD & A unilaterally granted an across the board wage increase for the first time in two and a half years to discourage unionization. Finally, on the day of the election, SD & A provided new ergonomic chairs to all employees.[3]

The company also engaged in the other isolated unfair labor practices detailed in the district court's order. These included instances of interrogation of employees regarding their union sympathies, refusal to allow the distribution of union literature, enforcing dormant work rules in order to discourage employees from supporting the Union, and at least one instance of surveillance of Union activities.

By March 24, 1999, the Union nevertheless had secured majority support. The Union presented 56 signed authorization cards from a bargaining unit of 97 employees. SD & A contends that eight of these cards are invalid because six of the cards

1. These meetings are termed "captive audience" meetings because they are held during work time and employees are required to attend.

2. SD & A had also hired an additional 38 new employees in February and March despite a January 27 decision to lay off about 15 callers because of a post-Christmas lull and the company's poor financial outlook.

   The company contends that it did not actually attempt to "pack" the bargaining unit and points out that its 1999 hiring was not out of line with its 1998 hiring. We are unpersuaded. There is no evidence that the 1998 hiring followed an explicit decision to lay off a number of employees. Second, the

district court explicitly enjoined packing the bargaining unit, suggesting it found the evidence of packing persuasive. Furthermore, a finding of packing is not necessary to support the granting of an interim bargaining order because of the total number and severity of unfair labor practices in this case.

3. One of the primary complaints of SD & A employees was management's failure to provide comfortable and safe equipment. The provision of new chairs addressed one of the key issues that prompted employees to organize. SD & A also had provided new ergonomic headsets about 10 days earlier.

were secured through misrepresentation, two of the cards were revoked (including that of one employee who also alleged improper solicitation) and one of the cards was signed by a supervisor. SD & A supported these contentions with affidavits of the card signers. If the company were to succeed on all of its challenges (i.e., if all eight of the disputed cards were held invalid), the Union would be one card short of a majority. On the other hand, then, the Regional Director need only show that one of the disputed cards is arguably valid to establish a majority.

Upon asserting majority status, the Union proposed a procedure whereby a neutral, third party would verify the validity of the authorization cards and, upon verification, SD & A would recognize the Union. The company declined. In April 1999, the Union demanded that SD & A recognize the Union and begin the process of collective bargaining. Again, the company refused. A representation election was held on June 3, 1999. Although 56 employees had signed authorization cards, only 31 voted in favor of union representation. Fifty-three employees voted against.

On June 10, 1999, the Union filed charges with the Board alleging that SD & A's antiunion campaign violated sections 8(a)(1), (3), and (5) of the NLRA.[4] On July 30, 1999, the Regional Director issued an unfair labor practice complaint. On October 30, the Regional Director filed this action, seeking interim injunctive relief under section 10(j) pending completion of the Board administrative proceedings. The Regional Director also sought an interim bargaining order. The district court ordered SD & A to cease and desist from engaging in unfair labor practices, to post copies of the order at SD & A's facility, file an affidavit with the court certifying that SD & A is in compliance with the order, and grant the Regional Director reasonable access to the company's facility in order to monitor compliance with the posting requirement. The court, however, denied the request for an interim bargaining order. The Regional Director appeals.

## II

■ We will reverse a denial of a section 10(j) injunction where the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Miller,* 19 F.3d at 455.

## III

At the outset, SD & A argues that a district court, exercising jurisdiction pursuant to section 10(j), has no authority to impose an interim bargaining order where a union has yet to be certified as the collective bargaining agent of the employees. SD & A contends that the purposes of section 10(j) are best served when a court preserves an employer's nonunion status pending ultimate resolution of the underlying unfair labor practices by the Board. Both the language and legislative history of section 10(j), however, indicate that a district court should order the relief necessary to prevent those persons who have violated the act from "accomplishing their unlawful objectives before being placed under any legal restraint." S.Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947). In certain cases, that relief will include the issuance of an interim bargaining order. "Almost from the inception of the Act . . . , it was recognized that a union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8(a)(5)." *National Labor Rela-*

---

4. Under these sections, "[i]t [is] an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights [to join labor unions and bargain collectively]; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[;] . . . [and] (5) to refuse to bargain collectively with the representatives of his employees. . . ." 29 U.S.C. §§ 158(a)(1), (3), (5).

*tions Board v. Gissel Packing Co.*, 395 U.S. 575, 596–97, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ Section 10(j) provides that in response to a petition from the Regional Director for injunctive relief, the district court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). We have previously held that a district court adjudicating a section 10(j) request should rely on traditional equitable principles to determine whether interim relief is appropriate. *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449 (9th Cir.1994) (en banc). Under *Miller*, a district court acting pursuant to section 10(j) operates as a traditional court of equity while "bearing in mind that the underlying purposes of section 10(j) are to protect the integrity of the collective bargaining process and to preserve the [Board]'s remedial power while the Board resolves the unfair labor practice charge." *Id.* at 452.

The traditional section 10(j) relief—a cease and desist order—will not always effectively protect the Board's remedial power. *See, e.g., National Labor Relations Board v. Electro–Voice, Inc.*, 83 F.3d 1559, 1575 (7th Cir.1996) ("Ordering an employer to cease his illegal activity, without more, will in some cases preserve the fallout of the illegal activity without preserving the Board's remedy."); *Seeler*, 517 F.2d at 37–38. To permit illegal employer conduct to go unaddressed while the Board's corrective machinery grinds toward resolution would subvert the underlying purposes of section 10(j) and allow those who commit unfair labor practices to reap the benefits of that conduct. Interim bargaining orders are therefore sometimes necessary "to preserve the status quo pending litigation" before the Board. S.Rep. No. 105, *supra; Seeler*, 517 F.2d at 38.

In arguing that section 10(j) does not authorize interim bargaining orders prior to certification, SD & A asks us to follow the rule articulated by the Fifth Circuit in *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975). In *Boire*, the court affirmed a district court's refusal to issue an interim bargaining order, reasoning that an interim bargaining order "would create by judicial fiat a relationship that has never existed." *Boire*, 515 F.2d at 1194.

While recognizing that injunctive relief under section 10(j) is intended to preserve the status quo pending final action by the Board, the *Boire* court erroneously identified the status quo to be preserved as that period before any union organizing activity took place: "The signing of union cards precipitated the entire controversy; hence the status quo ante was that period prior to any union activity when [employees] were unrepresented." *Id.* In contrast, as noted above, this Circuit has held that section 10(j) serves a dual purpose: the protection of the collective bargaining process and the preservation of the Board's remedial power. *Miller*, 19 F.3d at 452. The signing of union cards by employees is a preliminary and necessary step towards any collective bargaining relationship. The *Boire* holding—by nullifying the legal actions that advance collective bargaining along with the illegal actions that subvert it—actually hinders rather than protects the collective bargaining process.

An approach more consistent with the legislative purpose behind section 10(j) has been adopted by the majority of the circuits to address this issue. Rather than return employees to their status before they contacted the union and began the process of organizing, a district court should "restore the status quo as it existed before the onset of unfair labor practices." *Seeler*, 517 F.2d at 38; *Electro–Voice*, 83 F.3d 1559 (affirming an interim bargaining order prior to certification where employer fired one-third of the workforce in response to union organizing effort); *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 28 (1st Cir.1986) (citing *Seeler* and affirming the grant of an interim bargaining

order as "a just and proper means of restoring the pre-unfair labor practices status quo"); *Levine v. C & W Mining Co.*, 610 F.2d 432 (6th Cir.1979) (rejecting *Boire* and holding that the rule as articulated in *Seeler* is "more in accord with the purposes of the Act").

In sum, the language of section 10(j), the legislative purpose behind the measure, and the weight of legal authority all compel the conclusion that a district court has the authority to issue an interim bargaining order prior to certification of the union. Therefore, we next consider whether an interim bargaining order should have been entered in this case.

## IV

The Regional Director is ultimately seeking a permanent bargaining order after full administrative proceedings before the Board. To obtain a bargaining order, the Regional Director must show that the Union achieved majority status and that the impact of the unfair labor practices would make holding a new election fruitless. *See, e.g., Pay'n Save Corp. v. National Labor Relations Board*, 641 F.2d 697, 702 (9th Cir.1981).

Here, the Regional Director asks for an interim bargaining order to take effect while final Board action is pending. In *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449 (9th Cir.1994) (en banc), this Circuit established clear standards to guide courts in fashioning interim relief appropriate to assure the effectiveness of bargaining orders later issued by the Board.

We conclude that the Regional Director has made the showing required by *Miller.*

## A

To secure relief under section 10(j), the Regional Director must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor,

and at least a fair chance of success on the merits." *Id.* at 456 (quoting *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992)). This formulation reflects the traditional "sliding scale" of equity jurisprudence where "the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir.1992) ("where the government can make only a colorable evidentiary showing of a violation, the court must consider the possibility of irreparable injury").

In *Miller*, we modified this traditional formulation in one respect. In the context of a section 10(j) petition, the court must evaluate the traditional equitable criteria "through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power." *Miller*, 19 F.3d at 459–60. The Board's ability to meaningfully adjudicate disputes arising within its jurisdiction must be balanced against the respondent's showing of hardship. *Id.* at 460.

## B

In *Gissel*, the Supreme Court held that the Board may order an employer to recognize and bargain with a union even when employees have not chosen union representation through the normal election procedure. These "bargaining orders" are appropriate in two limited circumstances. First, when an employer has engaged in such "outrageous" and "pervasive" unfair labor practices "that a fair and reliable election can't be held," the Board may order bargaining even absent a showing of majority support for the Union. 395 U.S. at 613–14, 89 S.Ct. 1918. Second, the Board may order bargaining when the Union shows that it once had a majority and that its support was "undermined" by unfair practices that "impede[d] the election process." *Id.* at 614, 89 S.Ct. 1918.

■■■ The Regional Director argues that SD & A's conduct falls into the latter category. Consequently, he must show both that the Union secured the support of a majority of SD & A's employees and that SD & A subsequently engaged in unfair labor practices that undermined the Union's majority and impeded the election process. In the context of a section 10(j) petition, the Regional Director need not prove these contentions by a preponderance of the evidence (as he would have to do in an administrative proceeding). Rather, to satisfy the "likelihood of success" prong of the traditional equitable test, he need only show "a better than negligible chance of success." *Electro–Voice*, 83 F.3d at 1568 (citing *Kinney v. Int'l Union of Operating Engineers, Local 150, AFL–CIO*, 994 F.2d 1271, 1279 (7th Cir.1993)); *Miller*, 19 F.3d at 460 ("as an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits") (citation and alteration omitted). If the Regional Director satisfies this minimal requirement, *Miller* instructs the district court to balance the hardships resulting from the Director's requested relief. 19 F.3d at 460.

1. Likelihood of success on the merits

a. Majority status

■■ Whether the Regional Director provided sufficient evidence of majority status turns on the validity of the eight disputed union authorization cards. If SD & A shows the cards are invalid, the Regional Director would fail the first prong of the *Gissel* test for issuance of a bargaining order. But the Regional Director need only show that one card is valid to satisfy the likelihood of success prong under *Miller*. Faced with conflicting evi-

dence concerning the validity of the cards, the district court found that the Regional Director had not made a sufficient showing of majority support. The court, however, applied an erroneous legal standard and based its decision on clearly erroneous findings of fact. *Bogovich v. Sandoval*, 189 F.3d 999, 1001 (9th Cir.1999) ("A district court may abuse its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact").

■■■ A conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction. *Levine*, 610 F.2d at 435 (regional director met his burden of proof despite existence of conflict in the evidence); *Asseo*, 805 F.2d at 25 (affirming interim bargaining order issued even though company affidavits contradicted Board's evidence). To hold, as the district court did here, that the existence of disputed facts prevents the issuance of section 10(j) relief is to apply a standard equivalent to (or even more demanding than) the preponderance of the evidence standard.[5] Under *Miller*, the Regional Director "can make a threshold showing of likelihood of success" simply by presenting "some evidence" in support of his contention "together with an arguable legal theory." *Miller*, 19 F.3d at 460.

■■ The evidence supporting the Regional Director's contention of majority support easily surpasses this minimal showing. The cards themselves are unambiguous. Each card states simply that the card signer "authorized the above named Union to represent me in collective bargaining with my Employer." In *Gissel*, the Supreme Court held that

---

5. In holding that the Regional Director had not satisfied his burden for a showing of majority support, the district court stated:

There are these lingering questions raised by these other authorizations or the ones that had been brought to the Court's attention.... I think that's the problem that I have here in trying to look at their testimo-

ny, their declarations, and what you end up with is just what the person has pointed out, it's a credible question of credibility. I am not prepared to make on the showing that has been made thus far, however, the further finding that the petitioner has shown a majority in this case.

employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorized the union to represent him and then telling him that the card will probably be used to get an election.

*Gissel,* 395 U.S. at 606–07, 89 S.Ct. 1918; *accord Pay'n Save Corp.,* 641 F.2d at 703. To refute the validity of a card on the basis of misrepresentation, therefore, SD & A must show that the card signer was told "that his card will be used for no purpose other than to help get an election." *Gissel,* 395 U.S. at 609 n. 27, 89 S.Ct. 1918 (citing *Levi Strauss & Co.,* 172 NLRB No. 57, 68 L.R.R.M. 1338, 1341–42 & n. 7 (1968)).

Six SD & A employees assert through affidavits that this is what they were told. But one of those employees, Wushena Edwards, also testified to the following when deposed:

Q: How is it that you came to sign that card?

A: Because I was told that signing this will give us the right to vote in the election.

. . .

Q: Did he say that the card was going to be first used to ask the employer to recognize the union?

A: Can't recall.

Q: Did he say that if the employer didn't recognize the union, there would be an election?

A: Can't recall.

The employee who solicited Ms. Edwards' card testified that he solicited each card with a "standard kind of approach . . . let people know that we had to move for

direct recognition here, don't think it's going to work, we have a fallback of an election if that doesn't work. . . ." He further testified that his conversation with Ms. Edwards about the union authorization card did not differ from this standard approach.[6]

We faced indistinguishable facts in *National Labor Relations Board v. Anchorage Times,* 637 F.2d 1359 (9th Cir.1981), where we upheld a bargaining order issued by the Board. The company opposed enforcement on the grounds that the union had never secured majority status. "The Company's primary argument [was] that some fourteen of the authorization cards were invalid because the employees who signed them believed that the cards only requested an election and did not authorize the Union to represent them in collective bargaining." 637 F.2d at 1368. In support of this contention, the Company presented seven employees who "recall being told that the cards would be used to obtain an election but fail to recall if they were told that it was the only purpose of the card." *Id.* at 1369. The court held that the Board had presented sufficient evidence to support its decision that the seven cards were valid. *Id.*

Like the employees in *Anchorage Times,* Ms. Edwards alleges that she was told the card would be used for the purpose of an election, but cannot recall if she had been told anything else about the cards. Based on *Gissel* and *Anchorage Times,* there is sufficient evidence in the record for a finding that Ms. Edwards' card is valid. Consequently, there is little doubt that the evidence surpasses the minimal standard applicable in section 10(j) proceedings that the Regional Director "demonstrate a fair chance of success on the merits." *Miller,* 19 F.3d at 460.

Since the Regional Director needs only one card to establish the Union's ma-

---

**6.** The same employee solicited Robin Weaver. As we conclude that there is insufficient evidence of misrepresentation to Ms. Edwards, we believe that Robin Weaver's card is likely valid as well.

jority, Ms. Edwards' card is sufficient to find in his favor on this issue. The straight-forward language of the other five cards contested on the ground of misrepresentation and the affidavits of the solicitors that they made no such misrepresentations further persuade us that the Regional Director has established a sufficient likelihood of success on the issue of majority status.[7] Therefore, we now turn to the question of whether the unfair labor practices compel the granting of an interim bargaining order.

b. Severity of the unfair labor practices

The district court also held that the Regional Director had not satisfied his burden of showing that the unfair labor practices so undermined the Union's majority strength as to eliminate the possibility of a fair election in the future and compel an interim bargaining order.[8] Again, the district court imposed on the Regional Director an inappropriately high level of proof—a level inconsistent with the *Miller* standard. Consequently, the district court abused its discretion when it concluded that the Regional Director had not sufficiently shown a likelihood of success on the merits to justify an interim bargaining order. We again note that the likelihood of success test under *Miller* is minimal and that the "Board can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge together with an arguable legal theory." *Miller*, 19 F.3d at 460. The Regional Director satisfied the *Miller* standard by demonstrating a

"fair chance" that the Board is likely to issue a bargaining order subsequent to full adjudication of the merits.

We recognize that a bargaining order is an extraordinary and disfavored remedy for violations of the NLRA. *Gissel*, 395 U.S. at 602, 89 S.Ct. 1918 ("[S]ecret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support."); *National Labor Relations Board v. Chatfield–Anderson Co.*, 606 F.2d 266, 268 (9th Cir.1979) ("A bargaining order based on authorization cards is less desirable than the free expression of employees in a fair election."). Because a bargaining order is both an extreme and unusual exercise of the Board's authority, the Board must support the implementation of this remedy with " 'specific findings as to the immediate and residual impact of the unfair labor practices on the election process . . . .' " *National Labor Relations Board v. Pacific Southwest Airlines*, 550 F.2d 1148, 1152 (9th Cir.1977) (quoting *Peerless of America, Inc. v. National Labor Relations Board*, 484 F.2d 1108, 1118 (7th Cir.1973)). Thus, whether the Board will issue a bargaining order in the underlying administrative proceeding turns on the effect of the alleged unfair labor practices on a subsequent representation election. This inquiry is not mechanistic, but rather requires consideration of the specific facts of each case. In other words, in the wake of SD & A's illegal activity, is it possible for employees to make a free and

---

7. The Regional Director has also demonstrated a fair chance of success with regard to the two cards that were allegedly revoked. Because "the [Board] may properly disregard attacks on authorization cards made after employer unfair labor practices" have begun, *Pay'n Save Corp.*, 641 F.2d at 704, we will not regard those two cards as revoked. The company's first antiunion activity took place on January 28, 1999. The alleged revocations took place after that date.

8. Although the district court refused to issue an interim bargaining order, it did find that

the Regional Director had shown a likelihood of success on the underlying unfair labor practice charges. The court consequently enjoined those illegal practices. This order has not been challenged on appeal. The remaining issue, therefore, is not whether the Regional Director presented sufficient evidence that SD & A engaged in unfair labor practices, but only whether the Board will find that the unfair labor practices were sufficiently pervasive to justify an interim bargaining order.

informed choice regarding union representation?

▪ In arguing that the present controversy will not ultimately result in a bargaining order, SD & A highlights three aspects of the present controversy that counsel in favor of the lesser remedy of a new election. First, SD & A correctly contends that bargaining orders are more likely to issue when unfair labor practices have been visited upon small units of employees. *National Labor Relations Board v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir.1980) ("The probable impact of unfair labor practices is increased" and therefore a bargaining order more appropriate "when a small bargaining unit . . . is involved.").

▪ Bargaining orders are not limited to small units. In *Anchorage Times,* we enforced a bargaining order on an employer with a 181–person bargaining unit. 637 F.2d at 1362. And we will not apply the principle in these circumstances. In *Philips Industries, Inc. v. United Steelworkers of America*, 295 NLRB 717, 719 (1989), the Board refused to issue a bargaining order because the affect of the unfair labor practices "can more easily be dissipated" in a unit of 90 employees where only 10 percent of the employees had been affected by the employer's unlawful campaign. But in this case, the most serious alleged violation is the grant of benefits to the entire bargaining unit. These benefits included an across-the-board wage increase and the provision of new, improved equipment. Because these violations affected the entire 97–person bargaining unit, there is no basis to contend that this violation will not continue to impact the deliberations of all of the eligible voters. The size of the bargaining unit did not lessen the impact of the unfair labor practices here.

▪ SD & A next contends that a high rate of turnover in the industry will mitigate the damage caused by the unfair labor practices and permit a fair future election. Because many of those employees subjected to the unlawful behavior no longer work at the company, the lingering effect of the unfair labor practices will be minimal. *Cf. National Labor Relations Board v. Western Drug*, 600 F.2d 1324, 1326–27 (9th Cir.1979) (reversing bargaining order because Board failed to consider effect of employee turnover on fairness of a subsequent election). Even assuming that high turnover counsels in favor of a new election rather than a bargaining order,[9] SD & A has presented no evidence that would allow us to assess the level of turnover at the company. Without some evidence in the record that SD & A employees who experienced the antiunion campaign are no longer employed with the company, the factor of high turnover is of no relevance to the present question. *Cf. Cell Agricultural Manufacturing Co.*, 311 NLRB 1228, 1229 (1993) (burden on the employer to demonstrate why employee turnover should preclude the imposition of a bargaining order).

Finally, SD & A contends that the alleged unfair labor practices are simply not sufficiently egregious to warrant the imposition of a bargaining order. The Supreme Court in *Gissel* identified a "category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." *Gissel,* 395 U.S. at 615, 89 S.Ct. 1918. SD & A argues that the alleged violations fall into this category of de minimis infractions that neither impacted the outcome of the election nor prevent a free and fair second election from being held. In support of

**9.** There is some disagreement in this Circuit over whether the Board should consider events subsequent to the actual unfair labor practices in determining the propriety of a bargaining order. *Compare Western Drug,* 600 F.2d at 1326–27 *with National Labor Relations Board v. Bakers of Paris, Inc.,* 929 F.2d 1427 (9th Cir.1991). Since SD & A presented no evidence of relevant subsequent events, there is no need to address this issue in the present case.

this theory, SD & A emphasizes those actions that it did not take. For example, SD & A notes that it did not discharge, demote, suspend, or lay off suspected union supporters. Nor did it threaten a business closure if the Union were to organize successfully.

However, a wage increase (or grant of a benefit) designed to impact the outcome of a representation election is a "hallmark" violation of the NLRA and is as "highly coercive" in its effect as discharges or threats of business failure. *National Labor Relations Board v. Jamaica Towing Inc.*, 632 F.2d 208, 213 (2d Cir.1980). And, indeed, the Regional Director can point to several cases where grants of benefits formed the basis of a *Gissel* bargaining order. *See National Labor Relations Board v. WKRG–TV, Inc.*, 470 F.2d 1302 (5th Cir.1973); *Skaggs Drug Stores, Inc. v. National Labor Relations Board*, No. 72–2309, 1973 WL 3163 (9th Cir. Aug.23, 1973) (per curiam). The Regional Director further argues that the specific benefits granted by SD & A were calculated to maximize their coercive effect. For example, the ergonomic chairs—long sought after by members of the bargaining unit—were provided on the day of the election. In previously upholding a Board bargaining order, we have noted that

> the wage increases, which were granted immediately prior to the election, are the most significant among the many unfair labor practices cited by the Board. It is unlikely that those who received such benefits, or who heard of them, will forget that it is the Company that has the final word on wage increases and decreases.

*Anchorage Times*, 637 F.2d at 1370; *see also National Labor Relations Board v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964) (noting effectiveness of a "fist inside the velvet glove": "[e]mployees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which

may dry up if it is not obliged"). We conclude, then, that the unfair labor practices in this case were severe enough to justify an interim bargaining order.

Therefore, despite the disfavored nature of bargaining orders, the Regional Director has made a stronger case than SD & A that it will prevail after final proceedings before the Board. Further, the standard to be applied in a request for section 10(j) relief is distinct from that applied by the Board. The district court in a section 10(j) proceeding is not asked to make an independent determination as to whether a bargaining order is appropriate. Rather, in order for the Regional Director to satisfy the "likelihood of success" test under *Miller*, he need only present a "fair chance of succeeding on the merits." The existence of at least one "hallmark" violation of the NLRA (i.e., the wage increase) is sufficient to satisfy this minimal test and allow a consideration of the balance of hardships resulting from an interim bargaining order. The district court abused its discretion by not applying the less demanding *Miller* test and instead definitively concluding that the violations were not sufficient to justify an interim bargaining order.

### 2. Balance of the hardships

Because the district court held that the Board had not shown a likelihood of success under *Gissel*, it did not assess whether the failure to issue an injunction would cause irreparable harm to the Board's remedial authority. Nor did it undertake to balance the hardships of an injunction on the litigants. We are persuaded, however, that the Regional Director sufficiently showed a "fair chance of succeeding on the merits." Therefore, the propriety of the interim bargaining order depends on properly balancing the hardships between the litigants.

Under *Miller*, the court will presume irreparable injury once the Board has established a likelihood of success on

the merits. 19 F.3d at 460. If, however, the Regional Director has "only a fair chance" of success before the Board, then the court must balance the hardships resulting from the issuance of the requested relief. "Where the Board and the respondent each make a showing of hardship, the district court must exercise its sound discretion to determine whether the balance tips in the Board's favor." *Id.*

■ Although the Regional Director has made a stronger showing than SD & A that he will prevail before the full Board, we are not prepared to say that the showing is so strong as to justify a presumption of irreparable harm. For example, as noted above, we are presented with no evidence as to employee turnover in the bargaining unit and the possible impact that it would have on a new election. Additionally, we do not know whether the Union has been able to make any recovery from the unfair labor practices since the imposition of the cease and desist order. So having concluded that the Regional Director has "a fair chance" of success, we move to the balance of the hardships inquiry. We continue to keep in mind that under *Miller*, the "traditional equitable criteria [are to be] considered in the context of ... the underlying purposes of section 10(j), to protect the integrity of the collective bargaining process and to preserve the Board's remedial powers." 19 F.3d at 461.

The Regional Director argues that the balance of hardships tips in his favor for two reasons. First, the employees who showed a desire to organize by signing union cards are being deprived of the benefits of a union contract while the litigation proceeds. Second, a final *Gissel* remedy will be ineffective without an interim bargaining order because support for the Union will continue to wane in the absence of temporary relief. Therefore, according to the Regional Director, the fundamental purpose of section 10(j)—to preserve the Board's remedial power—requires an interim bargaining order in the present case.

The hardships identified by the Regional Director are significant enough to justify an interim bargaining order. "The value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost. If the Court does not issue a bargaining order, the Company will have succeeded for now in its efforts to resist the union organizing effort...." *Levine v. C & W Mining Co.,* 465 F.Supp. 690, 694 (N.D.Ohio), *aff'd* 610 F.2d 432 (6th Cir.1979). An interim bargaining order based on the Union's achievement of majority status also serves the policy concerns of the NLRA, which we must consider. "Fixing the status quo at any subsequent time [when union support has waned] would reward the company for violating the law, while fixing the status quo at any previous time [prior to majority status] would unfairly penalize the Union...." *Id.* at 693. The risk to SD & A from a bargaining order, in contrast, is minimal. The company is not compelled to do anything except bargain in good faith. 29 U.S.C. § 158(d); *National Labor Relations Board v. Western Wirebound Box Co.,* 356 F.2d 88 (9th Cir.1966).

■ The Regional Director also argues that absent an interim bargaining order, support for the Union will continue to wane. When the Board finally does grant relief, "the [U]nion may find that it represents only a small fraction of the employees." *Int'l Union of Electrical, Radio & Machine Workers, AFL–CIO v. National Labor Relations Board,* 426 F.2d 1243, 1249 (D.C.Cir.1970). With only limited support, moreover, the Union will be unable to bargain effectively regardless of the ultimate relief granted by the Board. Consequently, the Regional Director fears that the Board's remedial authority will be undermined without the protection of an interim bargaining order. This possibility is properly considered when balancing the hardships of interim relief under section 10(j). *Miller,* 19 F.3d at 460 ("[I]n considering the balance of hardships, the district court must take into account the probabili-

ty that declining to issue the injunction will permit the allegedly unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority."); *Asseo*, 805 F.2d at 27 (holding that "evidence was such that the district court could properly believe that, without an interim bargaining order, the Union would suffer irreparable harm").

▇▇▇ We must consider seriously the possibility that the Union cannot recover from SD & A's unfair labor practices without court intervention. While there is no evidence of ongoing antiunion activity in this case, the Sixth Circuit has rejected

> the contention that it [is] error to grant an injunction because there was no showing that the unfair labor practices were continuing. The short answer to this argument is that the antiunion campaign was so effective that the movement was quickly stifled.... [T]he continuation of unfair labor practices [is] not a prerequisite for temporary relief.

*Levine*, 610 F.2d at 436 (affirming district court imposition of temporary bargaining order to an uncertified union). We agree with the reasoning of the Sixth Circuit. We will not require the Union to engage in a new round of organizing to rebuild its support among SD & A employees. This conclusion is in accord with decisions in other circuits that the union should not bear the burden of recovering from the company's illegal activities. The company should not "profit[ ] through the delay that [administrative] review entails: all during this litigation it has not had to bargain collectively over wages or other financial aspects of employment." *Int'l Union*, 426 F.2d at 1250. Instead, as the Second Circuit concluded in *Seeler*, an interim bargaining order is appropriate if a company undermined a union's achievement of majority status before an election.

A final Board decision ordering a new election will leave the union disadvantaged by the same unfair labor practices which caused it to lose the first election. Even if the Board finally orders bargaining ..., the union's position in the plant may have deteriorated to such a degree that effective representation is no longer possible.

*Seeler*, 517 F.2d at 37–38; *see also Int'l Union*, 426 F.2d at 1249 ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find it represents only a small fraction of employees.").

▇▇▇ In this case, the Union had obtained as many as 56 valid authorization cards, but received only 31 votes in the election. Once the election was scheduled, SD & A used illegal practices to weaken union support. On the day of the union election, SD & A provided new ergonomic equipment that had previously been requested by employees. The company even promised that more benefits would follow, if they voted against the Union. A number of employees admitted that the company's tactics had made them afraid to join the Union. Just as it is illegal to fire employees or otherwise sanction them because they are union supporters, it is also illegal for SD & A to offer incentives to employees in exchange for their rejection of the Union. 29 U.S.C. § 157. The nature of SD & A's labor practices, as well as the record, supports the conclusion that such practices played a major part in this drop of support. To refuse to issue an interim bargaining order in these circumstances would allow SD & A to take advantage of the declining support for the Union and result in significant harm to the Board's remedial authority.[10]

---

**10.** Our previous decision in *National Labor Relations Board v. Peninsula Ass'n for Retarded Children and Adults*, 627 F.2d 202, 204–05 (9th Cir.1980), is distinguishable. There, we held that a bargaining order was not warranted because the unfair labor practices in the case had ceased four months before the election date. The impact of such dated viola-

A bargaining order merely requires the employer to bargain collectively and in good faith with a union. 29 U.S.C. 158(d); *National Labor Relations Board v. Western Wirebound Box Co.*, 356 F.2d 88 (9th Cir.1966). The only hardship described by SD & A is the cost of time and money involved in bargaining with the Union, which might not ultimately be certified. This alleged hardship alone cannot defeat an interim bargaining order. First, this is a burden that falls on both parties. Bargaining is costly to both sides, and the cost to SD & A should not be presumed to be more significant than the cost to the Union. Rather, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Int'l Union*, 426 F.2d at 1251. Second, there is always a risk—even if the company were to bargain with a certified union—that bargaining will ultimately be unsuccessful. There is no more uncertainty now than if the administrative proceedings result in a bargaining order. Lastly, the Supreme Court has endorsed the practice of looking to authorization cards to gauge employee support for a union. "[T]he cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when [the election] process has been impeded...." *Gissel*, 395 U.S. at 603, 89 S.Ct. 1918. At one time, before the Union felt the effects of SD & A's campaign, there was considerable employee support for unionization. Because there were as many as 56 signed authorization cards, we will not assume that bargaining with the uncertified Union will be fruitless. *See, e.g., id.* at 610, 89 S.Ct. 1918 (observing that the Board has authority to enter a bargaining order "even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered"). Successful bargaining could restore the employees' interest in the Union. *See, e.g., id.* at 612, 89 S.Ct. 1918 ("a bargaining order is designed as much to remedy past election damage as it is to deter future misconduct"). The cost of potentially unsuccessful bargaining does not tip the balance in favor of SD & A.

We therefore reject the proposition in *Scott v. Expresso Limousine Serv., Inc.*, No. 92–20334 SW, 1993 WL 181474, at *8 (N.D.Cal. May 28, 1993), that "[t]he potential for wasted resources engendered by a bargaining order outweighs any hardship the union might suffer by having to wait for a decision from the [Board]." This blanket assertion would lead logically to the conclusion that an interim bargaining order is never appropriate. Every company in SD & A's position would rely on the potential for wasted resources. If that concern is sufficient to defeat an interim bargaining order, then employers will always succeed.

Such an outcome directly contradicts our *Miller* decision, which counsels that "in considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." 19 F.3d at 460; *see also* S.Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1949) (quoted in *Miller*, 19 F.3d at 455 n. 3).

If the potential for wasted resources always defeats an interim bargaining order, employers will have an incentive to campaign against union organization. A subsequent order from the Board to bargain will have little to no impact if support for the union has already been destroyed. As the district court concluded in *Levine*,

tions was of questionable severity. Here, however, the unfair labor practices continued right up until the day of the election. The fact that a company's tactics have not continued since the election, as explained above, does not counsel against awarding the interim bargaining order. Rather, the lack of a union presence in the workplace as a result of an election can only serve to further undermine support for that union.

in contrast to the court in *Expresso*, "[A]ny harm to the Company from the bargaining order is offset by the value of lending relief to the Union and the employees now, rather than limiting the extent of possible future relief to inadequate make-whole compensation...." 465 F.Supp. at 694; *compare Scott v. Expresso Limousine Serv., Inc.*, No. 92–20334 SW, 1993 WL 181474 (N.D.Cal. May 28, 1993). The *Levine* decision better reflects the policies served by section 10(j) injunctions.

Therefore, as SD & A fails to present any other evidence of hardship beyond that faced by any company ordered to bargain with a union, we find that the balance of hardships tips in favor of the Regional Director. We reverse and direct the district court to enter an interim bargaining order.

REVERSED and REMANDED.

SNEED, Circuit Judge, dissenting:

The principles of labor law that guide the disposition of this case are clear and, for the most part, accurately stated by the majority. When faced with an effort by employees to unionize, the employer must abide by certain principles of neutrality. It may not "interfere with, restrain, or coerce employees in the exercise of" their rights "to form, join or assist labor organizations." 29 U.S.C. §§ 157, 158(a). Granting benefits to employees, threatening the termination of current benefits, and treating union supporters differently than other employees all contravene this fundamental principle. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *P.R. Mallory & Co. v. NLRB*, 389 F.2d 704 (7th Cir. 1967).

Furthermore, under *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir.1994) (en banc), the Regional Director need satisfy only a minimal burden to justify the grant of interim relief pending final adjudication of alleged unfair labor practices. The issue this case presents is whether the illegal actions of the employer justify the extreme remedy of a bargaining order.

This case involves a relatively small employer whose violations of the Act were relatively minor. A court-ordered demand to bargain, under the facts of this case, imposes a significant hardship on both employees and employers. When that hardship is measured against the threat to the Board's remedial authority in this case, the balance does not tip decidedly in favor of the Board. On these grounds, the district court's judgment should be affirmed, a bargaining order denied, and a lesser sanction imposed.

## I. Bargaining Orders

The bargaining order is the most severe sanction available to remedy employer unfair labor practices. "A bargaining order is not a snake-oil cure for whatever ails the workplace; it is an extreme remedy that must be applied with commensurate care." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 938 (D.C.Cir.1991) (internal citation omitted). The preferred remedy for employer unfair labor practices that affect the outcome of a representation election is to order a new election. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 602, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *accord L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337 (9th Cir.1980). This case does not meet the test required for issuing a bargaining order. "*Only where* there is a substantial danger that employees will be inhibited by the employer's conduct from adhering to the union should a bargaining order issue." *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 154 (2nd Cir.1981) (emphasis added).

In short, the "extraordinary and drastic remedy of forced bargaining ... is reserved for only the most unusual cases." *Be–Lo Stores v. NLRB*, 126 F.3d 268 (4th Cir.1997) (internal citations omitted). The NLRB must support its request for such extraordinary relief with "specific findings as to the immediate and residual impact of the unfair labor practices on the election process." *NLRB v. Pacific Southwest*

*Airlines,* 550 F.2d 1148, 1152 (9th Cir. 1977) (*quoting Peerless of America, Inc. v. NLRB,* 484 F.2d 1108 (7th Cir.1973)).

The Regional Director has failed to present sufficient evidence to support the "extreme" remedy of forced bargaining. SD & A very likely committed several unfair labor practices, most of which were de minimus in nature and would not justify imposition of a bargaining order. *Gissel,* 395 U.S. at 615, 89 S.Ct. 1918. Only its unilateral grant of benefits could possibly justify a bargaining order. *NLRB v. Anchorage Times Publishing Co.,* 637 F.2d 1359, 1370 (9th Cir.1981); *But see Skyline Distributors v. NLRB,* 99 F.3d 403, 411 (D.C.Cir.1996) (unilateral grant of economic benefits will almost never be sufficient to justify a bargaining order). Any perceived need for a bargaining order is outweighed by the hardship such an order would impose on employees of SD & A and on the company itself.

### A. Hardship on Employees

The majority ignores the hardship that a bargaining order will impose on the employees of SD & A. The core principles underlying the National Labor Relations Act (NLRA) are "freedom of choice and majority rule in employee selection of representatives." *Conair Corporation v. NLRB,* 721 F.2d 1355, 1381 (D.C.Cir.1983); 29 U.S.C. § 159(a) (union representation must be based on majority rule); 29 U.S.C. § 157 (granting employees the right to engage in or refrain from engaging in union activity). A bargaining order, by its nature, infringes these fundamental statutory rights.

It is true that in this case credible evidence exists that a majority of the employees of SD & A signed authorization cards indicating support for the union. Nonetheless, a substantial majority of those same employees subsequently voted against union representation. The majority attributes this turnabout to a series of unfair labor practices committed by the employer. However, it must be remembered that SD & A ran a vigorous campaign against the union. This campaign consisted, for the most part, of perfectly lawful attempts to dissuade its employees from joining the ILWU. I see no justification for the majority's holding that the full margin of victory for the company—some twenty-two votes—is attributable to the company's unfair labor practices. Neither the evidence of waning employee support for the union nor the nature of the employer's conduct supports such a finding.

In fact, a fair reading of the record indicates that the employer succeeded in convincing employees that union representation was inadvisable. Many employees came to see the collective bargaining process as a risky or even futile endeavor. Others grew tired of the conflict and strain of the union campaign and feared that such conflict would continue if the union won the election. Still others, for a variety of reasons, believed that a union workplace would not be in their own best interest. There is little doubt that the employer encouraged these concerns during weekly meetings and individual discussions with employees. Such conduct, however, is not illegal. It is part of the full and wide open discussion of "all of the arguments for, as well as against, unionization." *Excelsior Underwear,* 156 NLRB 1236, 1241 (1966).

In addition to its lawful attempts at persuasion, SD & A engaged in unfair labor practices. That fact alone is not sufficient to justify a bargaining order. It is the nature and effect of the unfair labor practices that is important. *Gissel,* 395 U.S. at 600, 89 S.Ct. 1918 (violations must be "likely to destroy the union's majority and seriously impede the election" to justify a bargaining order). The actual unfair labor practices at issue in this case are not the type that normally justify a bargaining order.

There were, after all, no firings of union supporters nor threats of business closure were the union to win the election. The employer violated the Act when it gave

employees the benefits they sought. The most serious allegation against SD & A is that it provided new equipment and higher salaries for its employees. It also promised that other benefits would follow if the union lost the election. If the union won the election, alternatively, SD & A managers allegedly told employees that they would have to start punching a time clock, they wouldn't be permitted to receive their paychecks early, and they would lose the "benefit" of lengthy cigarette breaks. The alleged discrimination against union supporters consisted of a single verbal reprimand of a union supporter and a single instance where the company prohibited the distribution of union literature to employees while they were at their work stations. I do not dispute that several of these actions, if proven, violated the NLRA. I question, however, whether the company's substantial margin of victory can be attributed to these acts, and, consequently, whether a bargaining order is appropriate.

In short, it is not possible to say why employees voted against union representation. Thus, a new election should be the preferred mechanism to resolve the discrepancy between the preference expressed on signed authorization cards and that expressed at the ballot box. Only a new election permits employees to fully realize their "inviolate right under the NLRA" to choose their own representative. *Skyline Distributors,* 99 F.3d at 411. A bargaining order, alternatively, substitutes the agency's "big (even good) brother judgment for a majority of employees' express choice of a bargaining representative." *Conair,* 721 F.2d at 1379.

This withdrawal of employees' core statutory rights constitutes a hardship that should weigh heavily in determining the appropriateness of § 10(j) relief. It is true

that *Miller v. California Pacific Medical Center* provides a lenient standard for the Regional Director to establish "likelihood of success" on the merits. However, we should be mindful that applying this same lenient standard to the "balance of hardships" prong creates the risk of depriving employees of their statutory right to choose (or not choose) union representation. On the limited record before us, the imposition of such a hardship is unwarranted.

## B. Hardship on Employers

The majority also understates the extent to which a bargaining order imposes a hardship on SD & A. The majority contends that recognition by this court that forced bargaining is a hardship "would lead logically to the conclusion that an interim bargaining order is never appropriate." *Maj. Op.* at 669. This is not so. Under *Miller,* when the Regional Director "demonstrates that it is likely to prevail on the merits, we presume irreparable injury." *Miller,* 19 F.3d at 460. Consequently, in those cases involving truly egregious unfair labor practices and obvious majority support for the union, an interim bargaining order would be appropriate.[1] In cases such as this one, *Miller* commands the district court to "exercise sound discretion" in balancing the hardships on the parties. *Id.* at 461. The exercise of sound discretion requires consideration of all the hardships on both sides of the scale.

Contrary to the majority's assertion, forced bargaining weighs more heavily on the employer than the union. The posture of the litigants in this case is persuasive evidence of that fact. The union, supported by the Regional Director, seeks a bargaining order. The company opposes one. The union, for good reason, would

---

1. Both *Levine v. C & W Mining Co.,* 610 F.2d 432 (6th Cir.1979) and *Seeler v. Trading Port, Inc.,* 517 F.2d 33 (2nd Cir.1975), relied on by the majority, involved far more egregious behavior than that alleged against SD & A. In *Seeler,* twenty union supporters were permanently laid off. In *Levine,* the district court

found the "apparent discharge of employees who were leaders in the organization of the union" and "threats of business closure." *See also, NLRB v. Electro-Voice, Inc.,* 83 F.3d 1559, 1565 (7th Cir.1996) (nine union supporters fired after union presented a letter demanding recognition).

not consider such an order a hardship. A primary purpose of a labor union is to negotiate contracts on behalf of its members. The successful culmination of this process presumably yields benefits to the employees (in the form of higher wages and improved conditions of work) and for the union (in the form of additional dues paying members). Generally, a union must first convince employees that they would benefit from such negotiations before it may bargain on their behalf. In the present case, the union wishes to forego this preliminary step and have this court order the employer to recognize and bargain with the union. Such an order, far from being a hardship, relieves the union of its obligation to secure the support of the employees. Its lawyers will have accomplished what its organizers could not. From the union's perspective, the remaining uncertainty as to whether a final contract will be signed is preferable to the dual uncertainty of whether the employees will desire the union's assistance *and* whether the employer will ultimately sign a contract.

The employer's perspective of a bargaining order is quite different. SD & A's primary purpose is not to negotiate with a union, it is to solicit donations on behalf of its clients. The diversion of resources from that purpose to collective bargaining is an unwelcome, albeit a sometimes necessary, hardship. A bargaining order would require the employer to bargain collectively and in good faith with the union. This obligation, in turn, requires the employer to invest time and resources, including the hiring of counsel, the preparation of materials necessary for meaningful discussions of terms and conditions of employment, and the presence and participation in negotiations of high level employees.

Congress has determined that the benefits of collective bargaining justify imposing these obligations on an employer when employees have freely chosen to be represented by a union. 29 U.S.C. § 141. The duty to negotiate with a union that may or may not ultimately be certified, however, must be considered a burden on the employer in the context of a 10(j) petition. *Scott v. Expresso Limousine Service, Inc.,* 1993 WL 181474 at *8 (N.D.Cal.1993) ("The potential for wasted resources engendered by a bargaining order outweighs any hardship the union might suffer by having to wait for a decision from the NLRB.") Where the alleged ULPs were relatively minor (as is the case here) and there is no evidence of continuing violations, this hardship is not justified. *Wilson v. Hart Ski Mfg. Co.,* 472 F.Supp. 484, 486 (D.Minn.1979) (where there is no evidence of continuing anti-union activity, the "Board's final order will therefore be as effective as an interlocutory order of this court"); *Hoffman v. Laser Tool, Inc.,* 151 L.R.R.M. (BNA) 2465 (D.Conn.1995) (discontinuation of illegal activity a "significant factor" influencing court to conclude that bargaining order unwarranted).

In conclusion, the Regional Director's request for a bargaining order is based on the allegation of an improper grant of benefits to employees and several minimal violations of the Act. "[T]he strength of the government's showing on the likelihood of prevailing on the merits will affect the degree to which it must prove irreparable injury." *Miller* at 459 (citing *United States v. Nutri–cology, Inc.,* 982 F.2d 394 (9th Cir.1992)). Given the minimal nature of the alleged violations, the lack of evidence of continuing violations, a bargaining order's inherent interference with the core statutory rights of employees, and the additional burden a bargaining order imposes on the employer, I conclude that the balance of hardships does not tip in favor of the board. The majority's alternative conclusion simply ratifies the Board's long-held "view that bargaining orders should be liberally granted as remedies despite evidence that a new election would suffice." *J.J. Newberry Co.,* 645 F.2d at 154.